David R. Markham (SBN 071814)
*dmarkham@markham-law.com*
Peggy Reali  (SBN 153102)
*preali@markham-law.com*
Janine Menhennet (SBN 163501)
*jmenhennet@markham-law.com*
Maggie K. Realin (SBN 263639)
*mrealin@markham-law.com*
**THE MARKHAM LAW FIRM**
750 B Street, Suite 1950
San Diego, CA  92101
Tel: (619)399-3995; Fax: (619)615- 2067

*Attorneys for Representative Plaintiffs and the Putative Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| DESERAE RYAN, and TRENT RAU, individually and on behalf of all others similarly situated,<br><br>              Plaintiffs,<br><br>v.<br><br>MICROSOFT CORPORATION, a Washington corporation,<br><br>              Defendant. | Case No. 14-cv-04634-LHK<br><br>**PLAINTIFFS' OPPOSITION TO MICROSOFT CORPORATION'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**<br><br>Date:       April 9, 2015<br>Time:      1:30 p.m.<br>Judge:     Hon. Lucy H. Koh<br>Courtroom:  8, 4th Floor |

# TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................1

II.    ARGUMENT ........................................................................................................2

    **A.**  The Applicable Statutes of Limitation Do Not Bar Plaintiffs' Claims ...............................3

        **1.**  The Limitations Periods for the Cartwright Act and California Business and Professions Code Claims Were Not Triggered Until 2013 because the Injury Was Unknown .................................................................................................4

        **2.**  The Limitations Period for the Sherman Act Claim Did Not Accrue Until 2013 Because Damages Remained Speculative Prior to 2013. ...............................5

        **3.**  The Four Year Statutory Period Was Tolled Because the Unlawful Agreement was Concealed from Plaintiffs .................................................................7

        **4.**  Plaintiffs Never Had Constructive Knowledge of Their Claims in 2009; the Statute Remained Tolled Until May 2013. ....................................................10

        **5.**  The Continuing Violation Doctrine Applies; thus the Statute of Limitations Did Not Begin to Accrue Until May 2013. .....................................................12

    **B.**  Plaintiffs' Sherman Act and Cartwright Act Claims Are Adequately Pled. .....................16

        **1.**  Plaintiffs Have Adequately Pled Evidentiary Facts Sufficient to Establish the Unlawful Agreement. ................................................................................16

        **2.**  Plaintiffs' Reliance on the Unlawful Agreement Memorialized by Microsoft's Co-conspirator is Sufficient ......................................................................19

        **3.**  Plaintiffs Adequately Pled the Motives for Microsoft Entering Into the Unlawful Agreement ...........................................................................................20

    **C.**  Plaintiffs' California Statutory Claims Are Sufficiently Pled; Sufficient Connections to California Were Pled. .................................................................................22

    **D.**  Plaintiffs' Adequately Pled Standing Sufficient to State a Claim Under the UCL. ..........23

    **E.**  Plaintiffs Adequately Pled Standing Sufficient to State a Claim Under §16600 ..............24

III.   CONCLUSION ....................................................................................................1

-i-

CASE NO.: 14-cv-04634-LHK
PLAINTIFFS' OPPOSITION TO MICROSOFT CORPORATION'S MOTION TO DISMISS
PURSUANT TO FED. R. CIV. P. 12(b)(6)

1

**TABLE OF AUTHORITIES**

2

3

**Federal Cases**

4

*Advanced Micro Devices, Inc. v. Intel Corp.*, 1991 U.S. Dist. LEXIS 21036 (N.D. Cal. 1991) ... 11

*Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184 (9th Cir. 1984) .................................................. 4, 5, 13

5

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................. 2, 20

6

*Aurora Enterprises, Inc. v. National Broadcasting Co.*, 688 F.2d 689 (9th Cir. 1982)................ 13

7

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................... 2, 3, 16, 20

8

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009) ................................................... 2

9

*Columbia Steel Casting Co., Inc. v. Portland General Electric Co.*, 111 F.3d 1427 (9th Cir. 1996) ................................................................................................................................ 14

10

*Conmar Corp. v. Mitsui & Co.*, 858 F.2d 499 (9th Cir. 1988)........................................ 8, 9, 10, 11

11

*Dang v. San Francisco Forty Niners*, 964 F. Supp. 2d 1097 (N.D. Cal. 2013) .............................. 3

12

*Dep't of Water & Power v. Allis-Chalmers Mfg. Co.*, 213 F. Supp. 341 ....................................... 8

13

*Google and Lee v. Microsoft Corp.*, 415 F. Supp. 2d 1018, 1019 (N.D. Cal. 2005) ......... 20, 21, 23

*Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 502, n.15 ......................................... 13

14

*Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1361 (9th Cir. 1976)............................................ 5, 6, 13

15

*Harris v. Duty Free Shoppers Ltd. Partnership*, 940 F.2d 1272 (9th Cir. 1991)............................ 7

16

*Haugh v. Depuy-Motech, Inc.*, 14 Fed. Appx. 883................................................................... 8, 9

17

*Hennegan v. Pacifico Creative Service, Inc.*, 787 F.2d 1299 (9th Cir. 1986)............................... 14

18

*Herremans v. BMW of N. Am., LLC*, 2014 U.S. Dist. LEXIS 145957 (C.D. Cal. 2014) ............ 7, 9

*Huck v. Pfizer*, 2011 U.S. Dist. LEXIS 81161 (S.D. Cal. 2011)........................................... 23, 24

19

*In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133 (N.D. Cal. 2009)................................ 3

20

*In re High-Tech Emple. Antitrust Litig.*, 856 F. Supp. 2d 1103 (N.D. Cal. Apr. 18, 2012)16, 17, 18

21

*In re TFT-LCD Antitrust Litig.*, 599 F. Supp. 2d 1179 (N.D. Cal. 2009) ............................... 3, 16

22

*Kaiser Aluminum, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045 (5th Cir. 1982)..................... 13

*Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008).................................................. 18, 19

23

*La Salvia v. United Dairymen of Arizona*, 804 F.2d 1113 (9th Cir. 1986) ................................... 13

24

*McCalden v. California Library Ass'n*, 955 F.2d 1214 (9th Cir. 1990)......................................... 3

25

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265 (8th Cir. 2004) ................................ 14

26

*Migliori v. Boeing N. Am., Inc.*, 114 F. Supp. 2d 976 (C.D. Cal. 2000) ............................... 8, 9, 10

27

*Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1 (1st Cir. 2011) ................................................ 2

28

*Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234 (9th Cir. 1987) ................................... 13, 14

-ii-

*Pecover v. Electronics Arts Inc.*, 633 F. Supp. 2d 976 (N.D. Cal. 2009) .......................................... 3

*Perry v. Moran*, 109 Wash. 2d 691 (1987) ......................................................................... 21

*Pesek v. Gates*, 247 Fed. Appx. 62 (9th Cir. 2007) ................................................................ 9

*Phillips v. Alaska Hotel & Restaurant Employees Pension Fund*, 944 F.2d 509 (9th Cir. 1991).. 13

*Poller v. Columbia Broadcasting Sys.*, 368 U.S. 464 (1962) ................................................ 3, 16

*Rescuecom Corp. v. Google Inc.*, 562 F.3d 123 (2nd Cir. 2009) ....................................... 2, 20, 25

*Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248 (9th Cir. 1978) ...................... 8, 11

*Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, n.4 (9th Cir. 2014) ...................... passim

*Smith v. Ford Motor Co.*, 749 F. Supp. 2d 980 (N.D. Cal. 2010) ...................................... 7

*Solo v. SD-3C LLC*, 751 F.3d 1081 (9th Cir. 2013) ................................................ 4, 5

*Starr v. Baca* 652 F.3d 1202 (9th Cir. 2011) ....................................................... 2

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508, n.1 (2002) ..................................... 2, 20

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264 (9th Cir. 1975) ............ 13

*Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899 (7th Cir. 2004) ....................... 3

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971) ................................. 4, 5, 13

**California State Cases**

*Advanced Bionics Corp. v. Medtronic, Inc.*, 29 Cal.4th 697 (2002) .................................. 7

*Aryeh v. Canon Business Solutions, Inc.*, 55 Cal.4th 1185 (2013) .................................. 4, 5

*Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 178 (2000).......................... 24

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003)............................ 23

*Limandri v. Judkins,* 52 Cal. App. 4th 326, 337 (1997) ....................................... 7

*Walnut Creek Manor v. Fair Employment & Housing Com.*, 54 Cal.3d 245, 263 (1991)............. 23

*Application Group, Inc. v. Hunter Group, Inc.,* 61 Cal. App. 4th 881 (1998).............................. 21

**California Statutes**

California Business & Professions Code section 16600 .................................... 3, 7, 24, 25

**Federal Statutes**

Fed. R. Civ. P. 8 ........................................................................ 2, 3

Fed R. Civ. P. 12 ....................................................................... 1, 2

**Treatises**

Schwarzer, Tashima & Wagstaffe, Cal. Prac. Guide: Fed. Civ. Pro. Before Trial (the Rutter Group 2012), § 9:183.) .................................................................... 2

-iii-

CASE NO.: 14-cv-04634-LHK
PLAINTIFFS' OPPOSITION TO MICROSOFT CORPORATION'S MOTION TO DISMISS
PURSUANT TO FED. R. CIV. P. 12(b)(6)

1

## I.     **INTRODUCTION**

2        Plaintiffs Deserae Ryan and Trent Rau ("Plaintiffs") oppose defendant Microsoft

3   Corporation's motion to dismiss this lawsuit.  Microsoft ("Defendant" or "Microsoft") argues that

4   the case should be dismissed as untimely and as failing to allege facts sufficient to support

5   Plaintiffs' claims.  Defendant is wrong on both counts.

6        Foremost, Microsoft freely and loudly admits that it favors anti-competitive contract

7   clauses, and sues to enforce the non-compete covenants. Mot., at 13.  This lends credence to

8   *Plaintiffs'* allegations that Microsoft had the motive to enter into the Google anti-poaching

9   agreement at issue in this lawsuit and which is already before this Court.  Because California

10  employees cannot be confined to the non-compete clauses, by reaching an agreement with

11  competitors in California not to poach, Microsoft reaches its goal of obtaining non-compete

12  agreements at the top level, bypassing California's restrictions on such clauses.

13       Plaintiffs herein accept Microsoft's invitation (Mot., at 4) to allege evidentiary facts

14  supporting their "conclusory statement" that Microsoft negotiated, entered into, and performed

15  the unlawful agreement:  the Agreement referenced in Exhibit 661 in the *High Tech* matter

16  ("Agreement").[1]  Microsoft is included in the list of companies present in the *High Tech*

17  litigation, a factor the Court must have considered when determining whether these two cases

18  were in fact related. Plaintiffs can amend their complaint to include specific reference to this

19  Agreement if the Court orders, but Plaintiffs at this time contend that their allegations are

20  sufficient to withstand the currently pending Rule 12(b)6 motion.

21       Concerning Defendant's statute of limitations affirmative defense, Defendant's analysis

22  overlooks significant legal authority regarding the accrual date for Plaintiffs' state claims, and

23  then inappropriately jumbles together its analysis regarding the equitable tolling doctrines that

24  apply to all claims here.  Defendant fails to overcome even a single one of the five separate

25  equitable or legal doctrines, any one of which is sufficient to establish Plaintiffs' complaint as

26  timely.  Accordingly, Plaintiffs have timely filed and sufficiently stated their claims for relief.

27

---

28  [1]     A true and correct copy of the Agreement is attached to the Declaration of Janine R.
Menhennet at Exhibit 661.

## II.     ARGUMENT

Defendant's Motion cites to several principles of law applicable to the Court's analysis on a 12(b)(6) motion.  But, it conspicuously omits the following pertinent legal principles which the Court is also bound to adhere to in analyzing these issues.

Foremost, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  The court must "accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2nd Cir. 2009) ("*Rescuecom*"); *Twombly*, 550 U.S. at 556 (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508, n.1 (2002) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations.")).  <u>All reasonable inferences from the facts alleged are drawn in plaintiff's favor in determining whether the complaint states a valid claim.</u> *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009) ("<u>*Twombly* and *Iqbal* did not change this fundamental tenet of Rule 12(b)(d) practice.</u>").  When a complaint's factual allegations are capable of more than one inference, the court <u>must</u> adopt whichever plausible inference supports a valid claim. *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  Thus, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts alleged is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.  <u>The court may not "attempt to forecast a plaintiff's likelihood of success on the merits.</u>" *Ocasio-Hernandez v. Fortuño-Burset*, 640 F.3d 1, 12–13 (1st Cir. 2011) (emphasis added).  It is no wonder that <u>even after *Twombly* and *Iqbal*, "dismissals for failure to state a claim have a high reversal rate on appeal.</u>" SCHWARZER, ET AL., FED. CIV. P. BEFORE TRIAL § 9:183 (Rutter Group 2012).

Furthermore, the courts are to keep in mind that "[e]ach allegation must be <u>simple, concise, and direct;</u>" *not* complex or overly-detailed. Fed. R. Civ. P. 8(d) (emphasis added).

-2-

1    Indeed, the Rules instruct that the complaint must be narrowed to "a <u>short</u> and plain statement of

2    the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  Complaints may not

3    be dismissed for omitting information about defenses. *Xechem, Inc. v. Bristol-Myers Squibb Co.*,

4    372 F.3d 899, 901 (7th Cir. 2004); *McCalden v. California Library Ass'n*, 955 F.2d 1214, 1219

5    (9th Cir. 1990).

6          In light of the above principles espoused in Rule 8 and in *Twombly* and its progeny, courts

7    in this circuit and district repeatedly decline to dismiss antitrust claims at the pleading stage.[2]

8          Here, Plaintiffs adequately alleged facts which, if established, entitle Plaintiffs to relief

9    under each cause of action challenged by Defendant's Motion.  Further, Plaintiffs had no duty to

10   plead around, for example, Defendant's statute of limitations defense. *Xechem*, 372 F.3d at 901;

11   *McCalden*, 955 F.2d at 1219.  Defendant's Rule 12(b)(6) motion to dismiss should be denied.

12

13   **A.      The Applicable Statutes of Limitation Do Not Bar Plaintiffs' Claims**

14         With the exception of Plaintiffs' California Business & Professions Code section 16600

15   claim, Plaintiffs agree with Defendant that each of Plaintiffs' claims are generally governed by a

16   four-year statute of limitations. *See* Mot. at 7:4, n.1.[3]  But, for the reasons stated below, Defendant

17   _____

18   [2]      *In re TFT-LCD Antitrust Litig.*, 599 F. Supp. 2d 1179, 1183 (N.D. Cal. 2009) (noting that
     *Twombly* does not require "elaborate fact pleading") (quoting *Poller v. Columbia Broadcasting*

19   *Sys.*, 368 U.S. 464, 473 (1962) ("*Poller*") ["<u>in complex antitrust litigation where motive and</u>
     <u>intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile</u>

20   <u>witnesses thicken the plot</u>"]);
          *Dang v. San Francisco Forty Niners*, 964 F. Supp. 2d 1097, 1115 (N.D. Cal. 2013)

21   (finding plaintiff sufficiently alleged an antitrust injury and denying defendants' motion to
     dismiss because "Plaintiff has met the plausibility requirement of showing that the item he

22   purchased would have been one affected by the allegedly anticompetitive agreement");
          *Pecover v. Electronics Arts Inc.*, 633 F. Supp. 2d 976, 983–85 (N.D. Cal. 2009) (denying

23   defendant's motion to dismiss plaintiffs' Sherman Act and Cartwright Act claims because "the
     court must take as true plaintiff's factual allegations that the exclusive deals between EA and the

24   NFL, AFL and NCAA 'killed off' competition and 'prevented [competitors] from re-entering the
     market'");

25         *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1138, 1142–50 (N.D. Cal.
     2009) (denying motion to dismiss Sherman Act claims because the complaint alleged enough

26   facts to state plausible claim for relief based on a price fixing conspiracy between defendants).

27   [3]      Defendant concedes that section 16600 et seq. lacks any specific statute of limitations.
     Mot. at 7:4, n.1.  In the Ninth Circuit, when a statute does not provide a limitations period, the

28   courts are not to fabricate a statutory period, but rather apply the doctrine of laches, using
     analogous statutory periods as mere "guidelines." *See Solo*, 751 F.3d at 1085–86.

-3-

1   is dead wrong in its contentions that Plaintiffs' claims never tolled, and that Plaintiffs' claims

2   accrued in either 2007 or 2009. *See id.* at 7:4-6. To the contrary, the limitations periods either did

3   not accrue until May 2013, or were tolled until that time.

4

5         **1.     The Limitations Periods for the Cartwright Act and California Business and Professions Code Claims Were Not Triggered Until 2013 because the Injury Was Unknown.**

6

7         Generally, a Sherman Act cause of action accrues when a defendant commits an act that

8   injures the plaintiff. *Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1190 (9th Cir. 1984) ("*Airweld*");

9   *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) ("*Zenith*"). But when it

10  comes to determining the accrual date of claims under California's Cartwright Act and Business

11  and Professions Code, the Ninth Circuit applies the common law "discovery rule" standard, thus

12  the accrual date is the discovery date; not the initial injury date that Defendant lobbies for in its

13  papers.[4] *Solo v. SD-3C LLC*, 751 F.3d 1081, 1087 (9th Cir. 2013) ("*Solo*") (finding the trial court

14  erred in dismissing as time barred plaintiffs' Cartwright Act and Unfair Competition Law Claims,

15  and holding: "[T]he district court should apply the California Supreme Court's recent decision in

16  *Aryeh v. Canon Business Solutions, Inc*., 55 Cal.4th 1185, 1195 (2013) in determining whether

17  Plaintiffs' Cartwright Act claim was timely filed."; *see also Samsung Elecs. Co. v. Panasonic*

18  *Corp.*, 747 F.3d 1199, n.4 (9th Cir. 2014) ("*Samsung*") (holding the same as *Solo*). In *Samsung*,

19  the Ninth Circuit considered the statute of limitations' accrual date on the plaintiffs' Cartwright

20  Act claim and held:

21      "The Cartwright Act claim was dismissed based on a holding that the interpretation of California's antitrust statute was coextensive with the Sherman Act. This is no longer the law in California. *Aryeh v. Canon Business Solutions, Inc*., 55 Cal. 4th 1185, 1195, 151 Cal. Rptr. 3d 827, 292 P.3d 871 (2013) ("Interpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act, given that the Cartwright Act was modeled not on federal antitrust statutes but instead on statutes enacted by California's sister states around the turn of the 20th century." (citing *State of California ex rel. Van de Kamp v. Texaco, Inc*., 46 Cal. 3d 1147, 252 Cal. Rptr. 221, 762 P.2d 385 (1988))).

22

23

24

25

26  *Id.* at 1205, n.4, remanding to the district court with directions to apply *Aryeh*; *see also Aryeh*, 55

----

27  [4] Defendant argues for an accrual date of 2007 for *all* claims because that is when the injury first occurred. But then, Defendant later admits that "the 'delayed discovery' doctrine [. . .] applies to the California statutory claims." *C.f.*, Mot. at 8:6-9, 9:19.

28

1  Cal.4th at 1191–95 (the common law "discovery rule" applies, thus, the accrual date does not

2  occur "<u>until the plaintiff discovers, or has reason to discover, the cause of action</u>.")

3         Here, in addition to their Sherman Act claim, Plaintiffs have alleged violations of

4  California's Cartwright Act and other California Business and Professions Code violations

5  (sections 17200, 16720, and 16600 et seq.). ECF No.1 at ¶¶ 69–93.  Thus, per *Aryeh*, *Samsung*,

6  and *Solo*, the statute of limitations does not begin to run on these California claims until Plaintiffs

7  "knew or ha[d] reason to know of the injury which is the basis of the action." *Ibid.*  As the

8  Complaint makes abundantly clear, Plaintiffs had no knowledge of the Agreement, nor any

9  investigations or allegations about the Agreement until May 2013 at the earliest. ECF No. 1, at ¶¶

10  35, 37, 39, 57.  Furthermore, because neither the Agreement nor Microsoft's participation in the

11  Agreement were ever publicly confirmed until May 2013, Plaintiffs had no reason to know about

12  Microsoft's unlawful Agreement, let alone the specific terms of the Agreement and the scope of

13  employees covered by it. *Id.*

14
15
      **2.**      **The Limitations Period for the Sherman Act Claim Did Not Accrue Until 2013 Because Damages Remained Speculative Prior to 2013.**

16         As stated, the general rule is that a Sherman Act cause of action accrues when a defendant

17  commits an act that injures the plaintiff. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S.

18  321, 338 (1971) ("*Zenith*").  The action, however, will not accrue if at the time of the purported

19  injury the damages remained speculative. *Id.* at 338; *see Airweld*, 742 F.2d, at 1190 (the plaintiff

20  "relies on the related rule that a cause of action does not accrue on the date of injury if damages

21  are speculative.") "*Zenith* stands for the proposition that a plaintiff may recover for acts violative

22  of the antitrust laws committed prior to the statute of limitations date, but that he may only

23  recover those damages for such acts which accrued and became ascertainable within the period of

24  the statute." *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1361 (9th Cir. 1976) ("*Hanson*") (citing

25  *Zenith*, 401 U.S. at 338–42).

26         In *Hanson*, plaintiff filed his antitrust complaint on December 23, 1968, and argued that

27  he could recover for injuries occurring even before December 23, 1964 (i.e. even before the four

28  year statutory period) because his damages remained speculative until after that date.  The Ninth

-5-

1   Circuit agreed with this reasoning and held that "[T]he trial court's instruction that the jury had to

2   find an overt illegal act within the period of the statute was in error.  [The plaintiff] could have

3   recovered damages accruing to him after December 23, 1964, if those damages were not

4   ascertainable before that date and were caused by illegal conduct occurring entirely before that

5   date." *Id.* at 1361.  In other words, plaintiffs may still recover antitrust damages arising from an

6   injury that occurred *prior to* the four year statutory period, provided the damages remained

7   speculative until sometime during the available four year statutory period.  *Id.*; *see also Samsung*,

8   747 F.3d, 1204–05 (where the plaintiff could not "have known for certain" whether it would be

9   damaged at the time of the anti-trust violation, the harm was therefore "speculative at the time of

10   the initial wrong", thus plaintiff was "allowed to file suit once the harm crystallized" many years

11   after the statutory period otherwise expired.)

12        Here, Plaintiffs filed their complaint on October 16, 2014.  Thus, at a minimum, Plaintiffs'

13   statutory period stretches back to October 16, 2010.  Defendant argues that the injury only

14   occurred once in 2007, thus—according to Defendant—the injury occurred before the statutory

15   period and Plaintiffs' claims ought to be dismissed.  Mot. at 7:15-8:9.

16        Foremost, Defendant's contention that the injury occurred only once is incorrect. *See*

17   section III.A.5, below.  But, even assuming the injury only occurred once in 2007, any damages at

18   that point were entirely unascertainable by Plaintiffs because Plaintiffs did not know (i) any of the

19   terms of the unlawful Agreement; (ii) whether such an unlawful Agreement even existed; (iii) if it

20   did exist, whether Microsoft was a party; (iv) what scope of employees were covered by the

21   unlawful Agreement; and (v) over what periods of time.   Thus, from 2007 to May 2013—when

22   the unlawful Agreement was finally publicly disclosed—Plaintiffs were completely incapable of

23   determining damages resulting from the antitrust injury.  They certainly did not "know for

24   certain" whether or to what extent they had been damaged prior to May 2013. *See Samsung*, 747

25   F.3d at 1205.  As a result, Plaintiffs' claims did not accrue until after May 2013, and Defendant's

26   motion to dismiss them as untimely should be denied.

27   ///

28

-6-

3.     **The Four Year Statutory Period Was Tolled Because the Unlawful Agreement was Concealed from Plaintiffs**

Defendant next contends that the applicable statutes of limitation periods were never tolled as a result of Defendant's concealment of the unlawful Agreement because (i) Defendant had no duty to disclose the Agreement to Plaintiffs, and (ii) in the absence of a duty to disclose, Plaintiffs must allege that Defendant actively concealed the unlawful Agreement. Mot. at 8:14–9:28. Defendant is wrong.

First, Defendant absolutely had a duty to disclose to Plaintiffs its unlawful Agreement restricting Plaintiffs' employment opportunities. "Under California law, there are four circumstances in which an obligation to disclose may arise: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *Herremans v. BMW of N. Am., LLC*, 2014 U.S. Dist. LEXIS 145957, at *19–20 (C.D. Cal. 2014) ("*Herremans*") (citing *Smith v. Ford Motor Co*., 749 F. Supp. 2d 980, 987 (N.D. Cal. 2010) (citing *Limandri v. Judkins*, 52 Cal. App. 4th 326, 337 (1997)); *see also Harris v. Duty Free Shoppers Ltd. Partnership*, 940 F.2d 1272, 1276 (9th Cir. 1991) (holding that employer and employee were in a fiduciary relationship). Here, Defendant entered into the unlawful Agreement with its competitors, essentially side-stepping California's public policy prohibiting employment covenants not to compete. ECF No. 1 ¶ 70, 80, 86, 89 ; Cal. Bus. & Prof. Code § 16600; *Advanced Bionics Corp. v. Medtronic, Inc.*, 29 Cal.4th 697, 706–07 (2002). Not only did Plaintiffs not consent to these restrictions on their ability to gain employment elsewhere, they did not even know about these "backdoor" restrictions on their ability to work for Defendant's competitors. Such restrictions on their livelihood were obviously a material facts. Thus, Defendant had "exclusive knowledge of material facts not known to the plaintiff[s]." *See, Herremans*, 2014 U.S. Dist. LEXIS 145957, at *19–20. Defendant, therefore, had the duty to disclose this unlawful Agreement to Plaintiffs, and did not. *Id.* As such, Plaintiffs need not plead or prove that the concealment was fraudulent. *See Haugh v. Depuy-Motech, Inc.*, 14 Fed. Appx.

-7-

1   883, 886–87; *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978)

2   (stating that to establish fraudulent concealment as a tolling mechanism, there is no need to plead

3   active or intentional concealment where the law "imposes a duty upon the defendant to make

4   disclosure.").  Defendant had an affirmative duty to disclose, thus, Plaintiffs' pleading that the

5   agreement was concealed is sufficient to toll the statute.

6          Second, even if Defendant was somehow relieved of its duty to disclose, Defendant's

7   concealment was nevertheless active, and Plaintiffs have adequately pled as much:

8          "Microsoft's conspiracy and consent to the Anti-Solicitation Agreement
           suppressed Plaintiffs' and the Plaintiff Class' compensation, while simultaneously
9          restricting competition in the labor market in which Plaintiffs and the Plaintiff
           Class sold their services."  ECF No. 1 ¶ 34.

10         "Microsoft employees were not informed and did not consent to this agreement."
11         *Id.* at ¶ 34.

12         As a result of the Agreement, "Senior executives from Microsoft actively
           concealed their unlawful Restricted Hiring Agreements and its participation in the
13         conspiracy." *Id.* at ¶  37

14  The above allegations within the context of Plaintiffs' complaint are precisely in line with a

15  number of other decisions within the Ninth Circuit in which courts have applied the equitable

16  tolling doctrine of fraudulent concealment, and thereon denied defendants' statute of limitation

17  challenges. *See Dep't of Water & Power v. Allis-Chalmers Mfg. Co*., 213 F. Supp. 341 (applying

18  the fraudulent concealment doctrine and denying defendant's motion for summary judgment in an

19  antitrust case; denying defendant's motion for summary adjudication, holding that material issues

20  of fact exist as to whether defendant's concealment was fraudulent, such that the applicable

21  statute of limitations was tolled); *Migliori v. Boeing N. Am., Inc.*, 114 F. Supp. 2d 976, 977 (C.D.

22  Cal. 2000) ("*Migliori*") (denying motion for summary judgment because defendants failed to

23  satisfy their burden that plaintiffs' claims were time-barred since fraudulent concealment doctrine

24  applied); *and see Conmar Corp. v. Mitsui & Co.*, 858 F.2d 499, 501 (9th Cir. 1988) ("*Conmar*")

25  (plaintiff alleged the anticompetitive acts were "'by their very nature designed to conceal

26  themselves from detection' and that defendants 'actively, fraudulently and successfully concealed

27  the existence of their agreements, conspiracies, and anti-competitive conduct' by submitting false

28  documents, invoices, and customs forms, as well as by altering others, as described in the Mitsui

-8-

1    indictment." Such claims were sufficient to create a triable issue of fact regarding whether there

2    was fraudulent concealment).[5]

3         Here, after practically ignoring Plaintiffs' allegations, Defendant attempts to overstate the

4    pleading requirement, relying on *Haugh* for the mistaken proposition that the fraudulent

5    concealment doctrine cannot apply as long as plaintiffs had presumptive knowledge or inquiry

6    notice of the injury. Mtn., at 9:14-28. However, courts in the Ninth Circuit are clear that the

7    fraudulent concealment doctrine may still toll the statute of limitations even where plaintiffs are

8    placed on inquiry notice as to the wrong. *Migliori*, 114 F. Supp. 2d at 984 (holding, "A review of

9    the fraudulent concealment cases shows that suspicion of wrongdoing does not foreclose

10   application of the fraudulent concealment doctrine. . . . [T]he question is not whether a plaintiff

11   was on notice of some wrongdoing. Instead, the question is whether the plaintiff had knowledge

12   of facts, or should have known about facts, that placed him or her on notice of the specific cause

13   of action.") In holding the fraudulent concealment doctrine applied to toll the statute, the court in

14   *Migliori* reasoned as follows: years prior to the available statutory period, the plaintiff filed a

15   workers compensation claim, and "suspected that his exposure [to radiation] might have caused

16   his cancer. He also knew that Boeing had exposed him to radiation. However, he never knew of

17   the excessive amount until June 1999." *Id.* at 987.

18        Similarly, in *Conmar*, the Ninth Circuit applied the doctrine even where Plaintiff should

19   have suspected the wrong had occurred. *Conmar*, 858 F.2d at 500. There, defendant came under

20   investigation for possible customs violations, and allegations of "dumping" steel products, i.e.

21   importing them at below fair market value, in part by using false customs reports. The

22   investigations received <u>extensive news coverage</u>. The plaintiff filed suit four years *after* defendant

---

23   5    Defendant's reliance on *Herremans* and *Pesek v. Gates*, 247 Fed. Appx. 62 (9th Cir. 2007)

24   ("*Pesek*") is misguided. Concerning the allegations of active concealment, each of these cases is
     inapposite.

25        In *Herremans*, the court dismissed the claims because the dealer's statements of warranty
     could not be attributed to the manufacturer. The court reasoned that plaintiff alleged issues with a

26   car repaired by an unknown dealer, rather than BMW directly, and plaintiff cited no law for the
     proposition that an authorized dealer is an agent of the unknown manufacturer, *Id.* at *18, 21. Here,
     Plaintiffs allege that Microsoft itself engaged in the wrong.

27        In *Pesek*, 247 Fed. Appx. at 63, the Ninth Circuit barely even analyzed the fraudulent

28   concealment doctrine, except to conclude that it did not apply because defendant merely alleged that
     plaintiffs only allegation of fraudulent concealment was that defendant denied firing him.

-9-

importer was <u>indicted</u>, alleging that the anticompetitive acts were designed to conceal themselves from detection and that defendants had actively, fraudulently, and successfully concealed the existence of their agreements and conspiracies. The defendant moved to dismiss the lawsuit and for summary judgment on the ground that the four-year statute of limitations had run.  The district court granted the motion.  On appeal, the Ninth Circuit reversed, holding that there were genuine issues of material fact regarding whether information available before defendant's indictment was enough to put plaintiff on constructive notice of its claim, and whether the lack of information was due to defendant's fraudulent concealment so as to toll the statute of limitations. *Id.*

Here, the facts as pled weigh even more conclusively in favor of applying the fraudulent concealment doctrine because Plaintiffs never knew, nor were notified of: the existence of the Agreement, whether the Agreement involved Microsoft, whether the Agreement pertained to Plaintiffs versus some other scope of employees, and any other specific terms of the Agreement. On the pleadings before it, the Court simply cannot say, *as a matter of law,* that fraudulent concealment doctrine does not apply. *See Conmar*, 858 F.2d at 500, citing *In re Beef Industry Antitrust Litigation*, 600 F.2d 1148 (5th Cir. 1979) ("where plaintiffs knew or should have known of a similar antitrust complaint due to widespread industry publicity, this was 'not *as a matter of law* tantamount to actual or constructive knowledge of their claim' without awareness of 'some evidence tending  to support it.'").  At the very least, per *Conmar*, Plaintiffs ought to be able to put on evidence regarding this issue.

### 4.  Plaintiffs Never Had Constructive Knowledge of Their Claims in 2009; the Statute Remained Tolled Until May 2013.

Microsoft argues that Plaintiffs were on inquiry notice beginning in 2009 because that year the DOJ launched an investigation and announced its complaints against such companies in 2009. Mot. at 11:8-21 (citing Def.'s RJN Exs. "C", "D").  Foremost, Defendant misstates the level of knowledge required to disqualify Plaintiffs from relying on the fraudulent concealment doctrine. *See* section III.A.3, *supra*, (citing  *Migliori*, 114 F. Supp. 2d at 984 (mere "suspicion" of wrongdoing does not foreclose application of the fraudulent concealment doctrine), *and see Conmar*, 858 F.2d at 500.  For that reason alone, Defendant's position that plaintiffs should have

-10-

1  had "suspicion" of the claim is irrelevant.[6]

2       Furthermore, Plaintiffs neither knew nor should have known that they had a claim against

3  Microsoft as of 2009.  A review of Exhibits C and D to Defendant's RJN quickly reveals that the

4  DOJ never disclosed Microsoft as a company that it was investigating, and never disclosed the

5  Agreement. *Id.*  The DOJ publicly disclosed the name of numerous Silicon Valley companies that

6  were allegedly involved in some amorphous anti-solicitation agreements, but none of the

7  documents publicly filed or disclosed by the DOJ ever mentioned Microsoft. *Id.*  To be sure, prior

8  to May 2013 when Exhibit 661 was publicly filed with the Court in *In Re High-Tech Litigation*,

9  there was absolutely no publicly filed document identifying Microsoft as a member to the

10 unlawful Agreement; nor was there any public disclosure of precisely what the Agreement was

11 that these Silicon Valley companies had entered into.

12      In light of this fact, Microsoft feebly attempts to overcome its lack of any public record by

13 pointing to two obscure electronic periodicals published by the online division of the two cited

14 news organization. Mot. at 11:8-21 (citing Def.'s RJN Exs. "A", "B").  These two brief articles,

15 however, are insufficient to establish Plaintiffs somehow had actual or constructive knowledge of

16 the Agreement.

17      First, the online articles can hardly be deemed to provide constructive notice to the

18 average American citizen because public access is restricted to only those who agree to pay

19 between $194 to $347 per year for the privilege.[7]  Furthermore, these two brief articles never

20 confirm whether Microsoft was a party to any kind of unlawful agreement, much less describe

21 any of the specific provisions of the Agreement.  Instead, these two brief flashes in the gigantic

22 pan of online media only indicate the following substance about the Agreement and violation: that

23 the DOJ "is investigating whether a number of large U.S. Companies" entered into unlawful

24 _____

[6] Microsoft's reliance on *Advanced Micro Devices, Inc. v. Intel Corp.*, 1991 U.S. Dist. LEXIS

25 21036, *7 (N.D. Cal. 1991) is misplaced because that case expressly notes that silence or passive
   conduct may be fraudulent where the relationship between the parties imposes a duty to

26 disclose—such as in the present case. *Id.* (citing *Rutledge v. Boston Woven Hose & Rubber Co.*,
   576 F.2d 248, 250 (9th Cir. 1978)).  Further, in *Advanced Micro Devices*, the Court also noted

27 that various statements by the plaintiff's counsel in prior motions and hearings indicated that the
   plaintiff had at least constructive knowledge of the violations.

28 [7] RJN Exhibit "1" – the WSJ online charges $28.99 per month (or $347 per year.)  RJN Exhibit
   "2" – the NYT online charges $3.74 per week ( or $194 per year).

agreements. Def.'s RJN Ex. "A".  The specific terms of the Agreement are simply never disclosed in these short 1-page articles.

Regarding Microsoft in particular, these periodicals are even more cryptic, stating only the following: (i) the DOJ has "sought information from companies in the technology and biotech sectors, including [. . .] and Microsoft"; and (ii) "people with knowledge of the investigation said that Microsoft and Intel were also among the companies that received requests for information." In other words, even had Plaintiffs had access to these periodicals in real time, they would have been completely uninformed regarding, what the terms of the allegedly unlawful agreements were, whether Microsoft was a party to the allegedly unlawful Agreement, whether the agreements covered them or some other group of employees, and whether the DOJ was even actively investigating Microsoft.  Tellingly, the statements made about Microsoft were not even from an identifiable source, but rather from unidentified "people with knowledge of the investigation." *Id.*  These articles are far from attributing to Plaintiffs specific knowledge that Microsoft was in fact a party to the unlawful Agreement, let alone knowledge of the terms of that Agreement—something the public was only able to analyze beginning in May 2013.

The bottom line here is that Plaintiffs neither knew nor had constructive knowledge of Microsoft's unlawful Agreement, and the complaint adequately pleads as much:

> "At the time of the DOJ's investigation and findings, Microsoft was not disclosed as being a part of the Anti-Solicitation Agreements. ECF No. 1 ¶ 39.

> "Thereafter, on or about May 17, 2013, the identity of all (or almost all) of the companies who were parties to the Anti-Solicitation Agreements became publicly available; thus, in May 2013, for the first time ever, the public and Parties were able to learn that Microsoft was a party to the Anti-Solicitation and the Restricted Hiring Agreements." *Id.* at ¶ 39.

**5.   The Continuing Violation Doctrine Applies; thus the Statute of Limitations Did Not Begin to Accrue Until May 2013.**

Defendant argues that the continuing violation doctrine does not apply here for two reasons: (i) because Plaintiffs somehow had constructive knowledge of their claims, and (ii) because they completely failed to allege the statutory violations continued into the four year statutory period. Mtn. at 12:16-27.  Defendant is wrong on both counts.  For the reasons stated in section III.A.4 above, Plaintiffs never had actual or constructive knowledge about their claims

-12-

until May 2013.  And, for the reasons set forth in the immediately following paragraphs, Plaintiffs adequately alleged facts supporting a continuing violation.

In the antitrust context, a continuing violation will restart the statute of limitations. *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987) ("*Pace*").  The continuing violation theory saves a claim where the first act is outside the limitations period. *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 502, n.15; *La Salvia v. United Dairymen of Arizona*, 804 F.2d 1113, 1119 (9th Cir. 1986).  "In the context of a conspiracy to violate section 1 of the Sherman Act, the cause of action will begin to run anew whenever the defendant commits an overt act in furtherance of the conspiracy." *Hanson*, 541 F.2d at 1361, citing *Zenith*, 401 U.S. at 338; *Airweld*, 742 F.2d at 1190.  Notably, "courts apply the continuing violation theory frequently in antitrust cases." *Phillips v. Alaska Hotel & Restaurant Employees Pension Fund*, 944 F.2d 509, 520 (9th Cir. 1991) (emphasis added).

"To state a continuing violation of the antitrust laws in the Ninth Circuit, a plaintiff must allege that a defendant completed an overt act during the limitations period . . . ." *Samsung*, 747 F.3d at 1202, citing *Pace*, 813 F.2d at 238.  "This standard is meant to differentiate those cases where a continuing violation is ongoing—and an antitrust suit can therefore be maintained—from those where ***all*** of the harm occurred at the time of the initial violation." *Id.* (emphases added).  Thus, "the cause of action may also reaccrue, in the absence of a conspiracy to violate the antitrust laws, when the defendant commits an act which by its nature is a continuing antitrust violation. *Kaiser Aluminum, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1051 (5th Cir. 1982), *cert. denied*, 459 U.S. 1105, 74 L. Ed. 2d 953, 103 S. Ct. 729 (1983). "An example of this latter type of continuing violation is when a defendant actively enforces an illegal contract." *Aurora Enterprises, Inc. v. National Broadcasting Co.*, 688 F.2d 689, 694 (9th Cir. 1982) (citing *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1270 (9th Cir. 1975)).  Indeed, the Ninth Circuit has confirmed that "certain actions taken to enforce contracts made in violation of the antitrust laws were sufficient to restart the statute of limitations." *Samsung*, 747 F.3d at 1203, citing *Pace*, 813 F.2d at 237.

-13-

Likewise, even "non-legal actions taken pursuant to a pre-limitations period contract can lead a new cause of action to accrue." *Samsung*, 747 F.3d at 1203.  For example, in *Hennegan v. Pacifico Creative Service, Inc.*, 787 F.2d 1299 (9th Cir. 1986), the Ninth Circuit faced an arrangement in which a tourism company agreed to steer customers to preferred souvenir shops. *Id.*  The Ninth Circuit held that "a cause of action accrued each and every time that a tourist was shepherded away from the plaintiff's non-preferred shop because even though the agreement predated the limitations period, the agreement itself did not 'immediately and permanently destroy' plaintiff's business nor did it cause 'irrevocable, immutable, permanent, and final' injury." *Samsung*, 747 F.3d at 1203 (citing *Hennegan*, 787 F.2d at 1301).  Similarly, in *Columbia Steel Casting Co., Inc. v. Portland General Electric Co*., 111 F.3d 1427 (9th Cir. 1996) ("*Columbia Steel*"), the Ninth Circuit held that a power producer's refusal to wheel electricity in accordance with a pre-limitations contract constituted an overt act that restarted the statute of limitations. *Id*. at 1444–45. "Even though the anti-competitive agreement to divide the market between producers dated back to 1972, the anti-competitive acts of the parties to that agreement, taken pursuant to its terms, were sufficient to support an antitrust action 18 years later." *Samsung*, 747 F.3d at 1203 (citing *Columbia Steel*, 111 F.3d at 1444–45).  In both *Samsung* and *Columbia Steel*, subtle actions taken pursuant to a pre-limitations contract were sufficient to restart the statute of limitations. *Ibid.*  Tellingly, the Ninth Circuit has recognized that "[t]he typical antitrust continuing violation occurs . . . when conspirators continue to meet to fine-tune their cartel agreement." *Samsung*, 747 F.3d at 1203 (citing *Midwestern Mach. Co. v. Nw. Airlines, Inc*., (8th Cir. 2004) 392 F.3d 265, 269).

That is precisely what was alleged in the present case.  Here, contrary to Defendant's assertion that all of the allegations of violations and damages are in the past tense (Mot. at 12:27–13:2), Plaintiffs have alleged the antitrust violations are present and ongoing, and that even damages of the Defendant's ongoing acts pursuant to the unlawful Agreement continued:

- "Microsoft's conspiracy was a ***continuing*** violation through which Microsoft ***repeatedly*** invaded Plaintiffs' and the Plaintiff Class' interests by ***adhering*** to, ***enforcing***, and ***reaffirming*** the anticompetitive agreements described herein." ECF no. 1 ¶ 55

-14-

- "Microsoft communicated by phone and e-mail and through in-person meetings to *further* the conspiracy and the secrecy of the conspiracy as described in this Complaint." *Id.* at ¶ 56

- The Agreement "*suppresses* wages because other rivals *are* not actively soliciting employees through promises of higher salaries and benefits." *Id.* at ¶ 33.

- The "hiring restrictions *impact* all employees of participating companies. . ." *Id.* at ¶ 42

- "As additional companies joined the conspiracy and Unlawful Agreements, competition among *participating* companies for skilled labor *continued* to drop. . ." *Id.* at ¶ 43

ECF No. 1 (Emphases added).

Given Plaintiffs' complaint adequately pleads the continuing violation doctrine, Defendant relies on documents previously filed in in *In re High Tech Litigation* as support for its claim that Google "remov[ed its] Do Not Cold Call list" in December 2009. Mtn. at p.13, fn 5.  Notably, Defendant refers to these documents without requesting the Court take judicial notice. Nevertheless, the documents do not further Defendant's argument, but rather expose its weaknesses.

First, the documents cited by Defendant do not reference Microsoft in any manner whatsoever.  Thus, they simply do not evidence when or if Microsoft ever ceased compliance or enforcement of the Do Not Cold Call agreement.  In fact, to date, there is no pleading or document that either alleges or tends to prove that Microsoft has ever discontinued its illegal acts.

Second, the documents cited by Microsoft do not reference the Restricted Hiring Agreement in any manner.  Thus, they say nothing about if or when any party – including Microsoft – ceased compliance or enforcement of the Restricted Hiring Agreement.  Contrary to Defendant's argument, there is simply no evidence nor any allegation that Microsoft ceased its compliance and enforcement of the Agreement by 2009.  Thus, the continuing violation doctrine applies.

///

///

-15-

**B.      Plaintiffs' Sherman Act and the Cartwright Act Claims Are Adequately Pled.**

Defendant challenges the adequacy of Plaintiffs' Sherman and Cartwright Act Complaints, essentially claiming that Plaintiffs failed to plead with sufficient specificity.  As described below, however, Defendant is incorrect.  The complaint details precise time frames, provisions, and parties involved in the Agreement, and even incorporates the Agreement by reference.

**1.      Plaintiffs Have Adequately Pled Evidentiary Facts Sufficient to Establish the Unlawful Agreement.**

Defendant claims that Plaintiffs have not alleged sufficient facts to support their Sherman Act and Cartwright Act causes of action because they did not sufficiently allege facts showing the existence of an antitrust agreement entered into by Microsoft and other specific entities. Mot. at 14:17 –20:2.  Defendant cries out that Plaintiffs did not sufficiently allege "who, did what, to whom (or with whom), where, and when." *Id.* at 13:16–14:21.  As support, Defendant strains to distinguish the Plaintiffs' complaint from the complaint this Court deemed adequately pled in the related case of *In re High-Tech.*  However, Defendant's distinctions are immaterial, and Defendant's argument relies on an incomplete view of the relevant case law.

It is true that claims under the Sherman Act should detail "the actors, effect, victims, location, and timing" of the conspiracies. *In re High-Tech Emple. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1116 (N.D. Cal. Apr. 18, 2012).  But, as this Court held in *In re TFT-LCD Antitrust Litig.*, 599 F. Supp. 2d at 1183, *Twombly* does not require "elaborate fact pleading".  And, courts should be reluctant to dismiss antitrust complaints in the context of 12(b) or 12(c) because "in complex antitrust litigation [. . .] the proof is largely in the hands of the alleged conspirators. . ." *Id.* (quoting *Poller*, 368 U.S. at 473).

Thus, the Court is not bound to require intricate pleadings, detailing—prior to discovery— specific conversations between specific senior executives, and specific dates and content of said communications in advancement of the overall conspiracy. *See id.*  Tellingly, under the correct legal standard, this Court in *In re High-Tech* denied defendants' 12(b)6 motion to dismiss. *See In re High-Tech*, 856 F. Supp. 2d at 1126–27.

-16-

1      Here, Plaintiffs have adequately pled Microsoft agreed to be bound by the same unlawful

2    Agreement to which Google and others agreed to be bound. (i.e., Exhibit 661.)  And, the

3    complaint quoted and incorporated this Agreement by reference. ECF No. 1, ¶¶ 28, 36.  In

4    addition to citing the specific unlawful provisions of the Agreement, Plaintiffs allege that the

5    basis for their antitrust claims is that beginning in 2008, Microsoft (by way of its senior

6    executives) conspired with and entered into the Agreement with Google and other high tech

7    companies through direct, indirect, and explicit communications to refuse to competitively seek

8    contracts with one another's managerial employees, and to refuse to cold call each other's

9    employees. *Id.*, at ¶¶ 28–37.  The intent of this unlawful Agreement was to fix and suppress the

10   compensation of the conspirators' (including Microsoft's) employees at artificially low levels to

11   control labor costs and eliminate competition for skilled labor. *See*, *i.e.*, ECF No. 1 ¶¶ 2, 4, 5, 28,

12   29, 31, 40–44.

13      When compared to what this Court found sufficient with the *High-Tech* Complaint,

14   Plaintiffs have likewise sufficiently pled their claims—they both detail "the actors, effect, victims,

15   location, and timing" of the conspiracies. *See In re High-Tech Emple. Antitrust Litig.*, 856

16   F.Supp.2d at 1116.

17      For example, both allege that "senior executives" managed and enforced the challenged

18   agreements. ECF No. 1 ¶¶ 3, 6, 37.  Though this Court considered the *High-Tech* plaintiffs'

19   "senior executives" allegation to be borderline by itself, the Court nevertheless denied the motion

20   to dismiss and called attention to further allegations that provided further factual detail as to what

21   was meant by "senior executives" involved in the agreement. *Id.*   Here too, the allegations are

22   against a corporation (Microsoft) – not its employees; thus it is sufficient to allege that Microsoft,

23   through its senior executives - engaged in the unlawful Agreement.  Like *In re High-Tech*,

24   Plaintiffs here limited the allegations to agreements between "senior executives" at Microsoft.

25   ECF No. 1 ¶ 37 ("[s]enior executives at Microsoft reached this Restricted Hiring Agreement

26   through direct, and explicit communications. The executives actively managed and enforced the

27   Restricted Hiring Agreement through direct, and indirect communications.")  That said, if the

28   Court takes issue with the fact that Plaintiffs have not actually provided the first and last name of

-17-

1   Microsoft's "senior executives", plaintiffs can readily amend the complaint to name for example

2   Microsoft's CEO during the relevant time period, Steve Ballmer.

3   Furthermore, concerning the remaining questions pertaining to the unlawful Agreement—

4   the "effect, victims, location, and timing"—Plaintiffs adequately provide such information. *See*,

5   *i.e.*, ECF No. 1, at ¶¶ 1, 2, 40–44, 64, 68, 73, 81, 82, 88, 92, 93.

6   Thus, in terms of adequately pleading antitrust violations, Plaintiffs' complaint and the

7   complaint in *In re High-Tech* are immaterially distinct.  Furthermore, in *In re High-Tech*, the

8   Court <u>denied</u> the motion to dismiss.  So, even if there were some material distinctions between the

9   two cases, such distinctions do not necessarily counsel in favor of dismissal here.

10  After failing to meaningfully distinguish the present case from *In re High-Tech,* Defendant

11  cites *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008) ("*Kendall*"), remarkably

12  claiming that the instant case more closely resembles the facts pled in *Kendall* than *In re High-*

13  *Tech.*  In *Kendall*, however, the case involved borderline baseless allegations that Visa and

14  Mastercard conspired with Wells Fargo and Bank of America to price fix merchant charges every

15  time a credit card was used.  *Id.* at 1045–46.  The plaintiffs' in *Kendall* failed to even identify a

16  single specific term of any specific agreement among the alleged co-conspirators. *Id.* at 1048.

17  Instead, the plaintiffs' allegation regarding the allegedly unlawful agreement consisted of only the

18  following vague and factually unsupported conclusion: "[T]here is an agreement among all

19  financial institutions to charge a minimum merchant discount fee set by the Consortiums." *Id.*

20  Understandably, the court in *Kendall* held that the plaintiffs "do not allege any facts to support

21  their theory that the Banks conspired or agreed with each other or with the Consortiums to

22  restrain trade. . .  There are no facts alleged to support such a conclusion." *Id.*

23  In stark contrast to *Kendall*, here the Plaintiffs identified two specific unlawful provisions

24  within a specific Agreement memorialized in writing by one of Defendant's co-conspirators.

25  Notably, the memorialized Agreement also identifies all other co-conspirators to the Agreement,

26  many of whom were sued by the DOJ for entering into the illegal Agreement. *See* Ex. 661.

27  Moreover, in *Kendall* the plaintiffs' claim was not dismissed until after "the district court

28  [] allowed appellants to conduct discovery so they would have the facts they needed to plead an

-18-

1    antitrust violation in their amended complaint." *Id.* at 1046.  Here, Plaintiffs have alleged the

2    specific unlawful Agreement in their very first complaint, before being permitted an opportunity

3    to conduct any discovery at all.  *Kendall* is simply inapposite.  If anything, *Kendall* confirms

4    courts are reluctant to dismiss antitrust claims without first affording the plaintiffs an opportunity

5    to engage in discovery.

6
         **2.   Plaintiffs' Reliance on the Unlawful Agreement Memorialized by Microsoft's Co-
7              conspirator is Sufficient**

8              After admitting Plaintiffs have incorporated by reference the unlawful Agreement into

9    their complaint, Defendant goes to great lengths to argue that Exhibit 661 cannot form a factual

10   basis for Plaintiffs' allegation that Microsoft and Google, among others, agreed to restrict the

11   hiring of each other's employees. Mot. at 17:24–18:4-8.  Boiled down to its essence, Defendant's

12   argument here rests on the astonishing claim that Exhibit 661 does not permit the inference that

13   Google and Microsoft entered into either the "Do Not Cold Call" agreement or the "Restricted

14   Hiring" agreement. *Id.*  Defendant's argument is erroneous.  Not only does Exhibit 661 permit

15   such an inference, it expressly identifies the existence of such an agreement.

16             In pertinent part, the Agreement states the following regarding the "Restricted Hiring" and

17   the "Do Not Cold Call" provisions of the Agreement:

18            "The following companies have a special restriction as part of the 'Restricted
              Hiring' list: . . . Microsoft."  For each of these 'Restricted Hiring' companies,
19            Google has ___***agreed***___ to the following protocol:  . . ."

20             "The following companies have special ___***agreements***___ with Google and are part of
              the 'Do Not Cold Call' list. . . . Microsoft."  For each of these 'Do Not Cold Call'
21            companies, Google has ___***agreed***___ to the following protocol: . . . ."

22   The express language of this Agreement evidences, in plain English, that Google has in fact

23   "agreed" to the terms of the Agreement with the companies listed therein.  Ignoring this express

24   language, Defendant offers the preposterous suggestion that "perhaps" Google unilaterally created

25   internal policies that – despite the express language of said policies – were not actually

26   agreements of any kind at all. Mot. at 18:8-20.  Stretching for a possible motive as to why a

27   company like Google would go out of its way to unilaterally limit its ability to compete with its

28   competitors without anything in return, Defendant offers the possibility that "perhaps" Google

                                                    -19-

1    was afraid Microsoft would sue Google if it tried to hire or cold call any of Microsoft's

2    employees.  The notion that Google—after being sued once by Microsoft over a single

3    employee's breach of contract—would take unilateral measures to restrict its employment of not

4    only Microsoft's employees, but a number of other companies' employees, without any

5    reciprocity, is illogical to the point of absurdity.

6            But even if Defendant here were able to drum up some logical explanation for presuming

7    this Agreement is really just an internal memo, the explanation is immaterial.  In order for

8    Plaintiffs to have adequately pled a claim, their allegations need not be *the only* plausible

9    explanation. *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  They need be but

10   *one*—perhaps one of a thousand—plausible explanations, and the Court must draw all rational

11   inferences in favor of supporting a claim. *Rescuecom*, 562 F.3d at 127; *Twombly*, 550 U.S. at 556

12   (quoting *Swierkiewicz*, 534 U.S. at 508, n.1.  Thus, even if Defendant were—given enough time

13   and resources—capable of concocting a plausible explanation for why this Agreement with

14   Microsoft really isn't an agreement at all, it matters not. *Ibid.*

15
         **3.  Plaintiffs Adequately Pled the Motives for Microsoft Entering Into the Unlawful**
16           **Agreement**

17           Defendant argues that Microsoft had no incentive to enter into the unlawful Agreement

18   because, unlike California law—which generally prohibits covenants not to compete—

19   Washington law generally permits such covenants.  Therefore, Defendant contends that it had no

20   motive for achieving by way of an unlawful Agreement what it already could achieve lawfully

21   through covenants not to compete under Washington State law. Mot. at 19:4-23 (citing to a

22   covenant not to compete signed in *Google and Lee v. Microsoft Corp.*, 415 F. Supp. 2d 1018,

23   1019 (N.D. Cal. 2005)).

24           But, the proverbial wheels fall off of Defendant's argument upon merely scratching its

25   surface.  Foremost, Washington law does not grant a broad and uninhibited approval of covenants

26   not to compete.  To the contrary, for a covenant not to compete to be enforceable in Washington,

27   it must be deemed "reasonable." *Perry v. Moran*, 109 Wash. 2d 691, 698 (1987).  As a result,

28   Microsoft was <u>not</u> able to lawfully restrict the hiring of its top executives for all times, regarding

-20-

1   all scopes of employment, and over all geographic regions under Washington law.  Tellingly,

2   Microsoft's covenant not to compete at issue in *Google and Lee v. Microsoft* was extremely

3   limited in scope and applicability. *Id.* at 1019.  First, it only inhibited Lee's ability to gain

4   employment "for a period of one year thereafter." *Id.*  Second, during that year, it only inhibited

5   Lee's ability to gain employment that is "competitive with products, services, or projects on

6   which [Lee] worked" or gained proprietary knowledge of. *Id.*  Thus, contrary to Defendant's

7   argument, Microsoft was *not* able to achieve through a covenant not to compete the kind of

8   sweeping restrictions on hiring and on soliciting employees that Microsoft was able to achieve by

9   way of the "Do Not Cold Call" provision and the "Restricted Hiring" provision of the Agreement

10  at issue here.

11       Furthermore, Defendant's argument here assumes that its Washington State choice of law

12  provision would be upheld by reviewing courts.  But, this Court has previously drawn doubt on

13  the likelihood that Microsoft will be able to have Washington law apply in lieu of California law

14  – particularly where the employee seeks subsequent employment in California. *Google and Lee v.*

15  *Microsoft,* 415 F. Supp. 2d at 1023–25 (citing *Application Group*, *Inc. v. Hunter Group*, *Inc.*, 61

16  Cal. App. 4th 881 (1998),  ("Google and Lee have a colorable argument that California's interest

17  in adjudicating the validity of the covenant not to compete exceeds Washington's. [. . .]

18  California has a strong interest in protecting the freedom of movement of persons whom

19  California-based employers [ ] wish to employ . . . and we see no reason why these employees'

20  interests should not be deemed paramount to the competitive business interests' of out-of-state as

21  well as in-state employers. . . . California has a correlative interest in protecting its employers and

22  their employees form anticompetitive conduct by out-of-state employers. . .)  In holding that

23  courts may readily determine that California law should be applied to Microsoft's covenants not

24  to compete, it found that "Microsoft has a significant California presence." *Id.* at 1025.  Thus,

25  Microsoft had motive to seek a more reliable solution by way of the unlawful Agreement.

26       Finally, Defendant's argument overlooks the obvious: Microsoft was not able to restrict an

27  employees' employment by way of covenants not to compete unless that employee signed the

28  covenant not to compete.  Here, Defendant has not identified any pleading or proof that either of

-21-

1   the Plaintiffs ever signed such a covenant.  Thus, Microsoft's only means of achieving restrictions

2   on the Plaintiffs' subsequent employment was via the unlawful Agreement with Google and

3   others.

4         In sum, Microsoft's covenants not to compete—while potentially valid under Washington

5   law—are narrow in their potential application, are likely not valid to prohibit subsequent

6   employment in Silicon Valley, and can never be valid against employees who never agreed to

7   them.  Moreover, the fact that Microsoft sued Google before regarding a covenant not to compete

8   only reveals that Microsoft placed significant value in the ability to restrict its employees'

9   mobility.  Thus, Microsoft had ample incentive to enter into the Agreement.

10
11  **C.    Plaintiffs' California Statutory Claims Are Sufficiently Pled; Sufficient Connections to California Were Pled.**

12        Defendant contends that Plaintiffs failed to plead connections with California sufficient to

13  support Plaintiffs California statutory claims.  Defendant is wrong.  Defendant admits that such

14  claims are properly pled whenever it "reaches the localized effects of conduct affecting California

15  commerce," or "link[s] Defendant's contacts with California to the claims asserted against [it],"

16  or where the unlawful agreement or statements "emanated from California." Mot. at 20:26, 21:7-

17  13.  But, Defendant summarily concludes that Plaintiffs did not adequately plead as much.

18        To the contrary, Plaintiffs' complaint clearly states that Plaintiff Ryan is a resident of

19  California, and the unlawful Agreement "was not limited by geography" and it suppressed not

20  only Plaintiffs' wages, but also the wages in the entire labor market in which Plaintiffs' sold their

21  services by decreasing employee mobility in that entire high-tech labor market.  ECF No. 1, ¶¶

22  40–44.

23        Furthermore, Exhibit 661 identifies a total of 15 companies that agreed to be bound by the

24  "Do Not Cold Call" and "Restricted Hiring" provisions of the Agreement, and all but Microsoft

25  and one other company are California-based employers.  And, Microsoft has numerous

26  headquarters within California.[8]  It is no wonder that this Court previously found, "Microsoft has

27
28  [8] Microsoft has offices in Mountain View and San Francisco, California.  (Decl. of Janine Menhennet in support of Plaintiffs' Opposition to Motion to Transfer Venue, filed concurrently

-22-

1  a significant California presence." *Google and Lee v. Microsoft*, 415 F. Supp. 2d at 1025.

2  Furthermore, the Agreement in question was memorialized by Google, a California company, and

3  clearly affects California employees, thus California has a strong interest in protecting such

4  employees from noncompetition agreements that they never even agreed to be bound by. *See id.*

5  at 1025.  Thus, the complaint adequately pled that Microsoft's unlawful Agreement had

6  "localized effects of conduct affecting California commerce."

7

8  **D.      Plaintiffs' Adequately Pled Standing Sufficient to State a Claim Under the UCL.**

9          Defendant contends that under the UCL claim Plaintiffs may not recover the higher

10  compensation they would have received absent the unlawful Agreement, because – according to

11  Defendant, such monetary relief is not a "vested interest" and, as such it is not available under the

12  UCL. Mot. at 22:20-26.  Foremost, Defendant's conclusion is irrelevant here because Plaintiffs

13  have clearly alleged injunctive relief. ECF No. 1, Prayer for Relief, ¶ 7.  Thus, even if the Court

14  agreed with Defendant here, it cannot dismiss Plaintiffs UCL claim as Defendant has not even

15  attempted to challenge the injunctive relief alleged by Plaintiffs in their complaint.

16          Furthermore, Plaintiffs disagree with Defendant's conclusion that the monetary relief

17  sought here is unavailable under the UCL.  In the employment context, restitution is not limited to

18  recovery of money or property once in the possession of the plaintiff; it includes recovery of a

19  quantifiable sum of money and property that a plaintiff has a vested interest in. *Korea Supply Co.*

20  *v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (2003); *Walnut Creek Manor v. Fair*

21  *Employment & Housing Com.*, 54 Cal.3d 245, 263 (1991).  "In the employment context, payment

22  of wages unlawfully withheld from an employee are recoverable under the UCL." *Huck v. Pfizer*,

23  2011 U.S. Dist. LEXIS 81161, *30 (S.D. Cal. 2011) ("*Huck*"); *see Cortez v. Purolator Air*

24  *Filtration Prods. Co.*, 23 Cal. 4th 163, 178 (2000) (". . . unlawfully withheld wages are property

25

26  herewith, Exh. 2.)  And, through September, 2014, it had an additional office in Silicon Valley, its
    "research" division, a division which likely included putative class members in this lawsuit during

27  the relevant time period. *Id.* at Exh. 3. Microsoft does not deny that some of its recruiters are in
    Silicon Valley.  (Mtn. at 10, "Microsoft also does business in California, but it employs far fewer

28  employees – and far fewer recruiters – in California than in Washington.")  That a "majority" of
    Microsoft's recruiters in Washington only means that their headquarters are in Washington.

-23-

1    of the employee within the contemplation of the UCL.").  It follows that employees' vested

2    property interest in wages arises once they perform work for their employer. *See id.*

3            Here, Plaintiffs went to work for Microsoft with the understanding that they would be

4    compensated according to what the fair market supported for similar talent.  But, as explained in

5    the complaint, the fair market price for such talent was artificially altered by Defendant's

6    unlawful Agreement. ECF No. 1 ¶¶ 40–44.  As such, Plaintiffs unknowingly worked for

7    Microsoft at a price they believed was equal to the fair market value for such services, when in

8    fact, they were being severely underpaid for every hour, day, week, or month they worked. And,

9    Plaintiffs right to such compensation became immediately vested upon working those hours, days,

10   weeks or months. *See Huck*, 2011 U.S. Dist. LEXIS 81161 at *30.[9]  The UCL claim cannot be

11   dismissed.

12

13   **E.      Plaintiffs Adequately Pled Standing Sufficient to State a Claim Under §16600**

14           A plaintiff has a claim under California Business and Professions Code section 16600

15   when a contract restrains him from engaging in a lawful profession, trade, or business of any kind.

16   Cal. Bus. & Prof. Code § 16600.  Both injunctive and declaratory relief are available as equitable

17   remedies for violations of Section 16600.

18           Defendant argues that Plaintiffs cannot seek injunctive or declaratory relief under Section

19   16600 because they are former employees, and accordingly are not subject to the Agreement.

20   Mot. at 23:12-23.  But, even as former employees, Plaintiffs appear to be subject to the

21   Agreement, and there is no evidence nor pleading confirming that Microsoft has ceased to enforce

22   or advance this agreement.  Indeed, Microsoft was never a party to the DOJ settlement agreement,

23   and, to date, has never agreed to void this Agreement.

24           Further, the Agreement between Microsoft and Google (and others) appears to reach the

25   employees of participating companies even post-employment.  The Restricted Hiring provision

26   _____

27   [9] Defendant relies on the Court's holding in *In re High-Tech* on this issue.  From the record,
     however, it does not appear that plaintiffs in *In re High-Tech* ever advanced the same argument
     and authority as Plaintiffs do here: confirming that UCL claims in the employment context are
28   analyzed differently because the employees' right to compensation immediately vests.

-24-

states that the employers that are parties to the agreement "[w]ill not pursue manager level and above candidates for Product, Sales, or G&A roles – even if they have applied to Google." ECF No. 1 ¶ 36.  This restriction on hiring does not specify whether the restriction applies only to current employees or to all employees. The Agreement further states that "[a]s a general rule, we should not be recruiting staffing talent from any of our approved staffing partners." ECF No. 428-10, at p. 3.  These staffing partners no doubt work with current and former manager-level employees of Microsoft, who would then be subject to the Restricted Hiring Agreement.

Thus, Plaintiffs, having been employees of Microsoft invariably fall within the Agreement's reach.  At best the Agreement is ambiguous on this point, and all reasonable inferences must be drawn in a light most favorable to Plaintiffs at this pleading stage. *Rescuecom*, 562 F.3d 123 at 127.  Until Plaintiffs obtain declaratory and injunctive relief, they continue to face a threat of irreparable injury—the continued restraint from engaging in their high-tech profession, which is a violation of section 16600.

### III.   CONCLUSION

For the reasons stated, Microsoft's motion to dismiss should be denied outright.  If however, the Court finds any deficiencies in the complaint, plaintiffs ought to be permitted leave to amend as they have never amended the complaint before, and they have indicated specific examples of how they could readily amend the complaint to add more specificity if necessary, and upon completing basic discovery.


Dated:  January 15, 2015                          **THE MARKHAM LAW FIRM**

By /s/ Janine R. Menhennet
Janine R. Menhennet
jmenhennet@markham-law.com
Attorneys for Plaintiffs

-25-

CASE NO.: 14-cv-04634-LHK
PLAINTIFFS' OPPOSITION TO MICROSOFT CORPORATION'S MOTION TO DISMISS
PURSUANT TO FED. R. CIV. P. 12(b)(6)